Filed 9/22/14  P. v. Feflie CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065957 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF10004550) |
| RICHARD FRANKLIN FEFLIE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Richard T. Fields, Judge.  Affirmed in part, reversed in part, and remanded.

Maria Leftwich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Andrew Mestman and Steven Taylor Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendant Richard Franklin Feflie appeals from a judgment of conviction and sentence after a jury trial. A jury convicted Feflie of numerous counts related to stealing and using his neighbor's ATM card.

On appeal, Feflie raises two contentions. First, Feflie argues that his trial counsel rendered ineffective assistance by failing to object to portions of the prosecutor's closing arguments in which the prosecutor referred to the fact that Feflie never mentioned that he believed his brother had committed the crimes until Feflie testified at trial. According to Feflie, the prosecutor's use of Feflie's postarrest, post-*Miranda*[1] silence to impeach Feflie's trial testimony violated *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) because Feflie had invoked his right to remain silent after being advised of his rights.

Second, Feflie contends that there is insufficient evidence to support the trial court's true finding on one of the one-year enhancements that the court imposed pursuant to Penal Code section 667.5.[2] Feflie contends that the sentencing enhancement that was based on his prior conviction for possession of a controlled substance in January 2005

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)

[2] All statutory references are to the Penal Code unless otherwise specified.

2

should be stricken because the prosecutor failed to prove beyond a reasonable doubt that Feflie did not remain free from prison custody for a period of five years.

We reject Feflie's first contention that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's comments on *Doyle* grounds because Feflie cannot establish that it is reasonably probable that he would have received a more favorable result absent counsel's deficient performance. However, we agree with Feflie that there is insufficient evidence to support a true finding that he was not free from prison custody for a period of five years with respect to his January 2005 conviction. The court's true finding as to that allegation must be vacated and the corresponding enhancement term stricken. However, as the People point out, a limited remand to allow the prosecutor the option to present additional evidence with respect to this enhancement allegation is appropriate. We therefore affirm Feflie's convictions, but strike one of the four prior prison sentence enhancements imposed on Feflie with respect to a January 2005 conviction, identified as "Prior 01" in the court's sentencing minute order, and remand the matter to the trial court for the limited purpose of allowing the prosecutor to elect to present additional evidence with respect to that enhancement.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

On June 21, 2010, Francisco Contreras opened a new bank account with Wells Fargo. The teller told Contreras that he would receive an ATM card in the mail within

3

one or two weeks, and that three days after receiving the card, he would receive a PIN. On June 22, Contreras went to Mexico for three weeks.

When Contreras returned from Mexico, he realized that he had not received the Wells Fargo ATM card. He called Wells Fargo to inquire about the card. The Wells Fargo representative told Contreras that a card had been sent to him, and that it had been used on approximately seven or eight occasions.

Contreras reported the theft of his ATM card to police. At some point, police showed Contreras several photographs of a person withdrawing money from an ATM. Although Contreras was not certain of the person's identity after seeing the first photograph, after viewing the second photograph, he was 100 percent sure that the individual withdrawing money from the ATM was his neighbor, Feflie. Contreras recognized a tattoo on Feflie's right hand, as well as his hair and facial features.

On October 13, 2010, Detective Gail Gottfried of the Corona Police Department contacted Feflie at his home. Detective Gottfried told Feflie that she wanted to talk with him about some ATM transactions that had taken place. Feflie said that he did not "know anything about it." Detective Gottfried then showed Feflie two photographs taken at two different ATM machines. After Gottfried showed Feflie the photographs, the following conversation occurred:

> "Gottfried: You don't know anything about it? Is this you?
> "Feflie: Ahh, it looks like me, but –
> "Gottfried: Looks like you?
> "Feflie: --but I couldn't say it is.

4

"Gottfried: Okay. And how about this right here?

"Feflie: It could be me, but uh.

"Gottfried: Could be you? Uhm.

"Feflie: I don't know anything about it."

Feflie denied knowing Contreras and denied having used Contreras's ATM card.

Feflie testified on his own behalf at trial. He asserted that he neither stole Contreras's ATM card, nor used it to access Contreras's account. According to Feflie, the person seen in the photographs using an ATM is his brother, Leroy Feflie. Feflie testified that Leroy had stayed with Feflie for 10 days in June. After Leroy stole some of Feflie's personal property, Feflie asked him to leave. Feflie explained that he did not identify Leroy to Detective Gottfried because she never asked him whether he knew who the person in the photograph was and because he did not want to get his brother in trouble.

On cross-examination, Feflie was shown three photographs of Leroy. Feflie acknowledged that Leroy has curly hair, and that he sometimes wore his hair in an Afro. The prosecutor asked Feflie to show the jury the tattoos on his right forearm, which include images of a star and the points of a crown. Feflie testified that Leroy has a tattoo of a Playboy bunny icon on his arm.

B.    *Procedural background*

On August 17, 2012, the Riverside County District Attorney filed an amended information charging Feflie with four counts of obtaining the personal identifying information of another (§ 530.5, subd. (a); counts 1, 3-5); two counts of burglary (§ 459;

5

counts 2, 6); and one count of receipt of stolen property (§ 496, subd. (a); count 7). The amended information also alleged that Feflie had suffered four prior prison term convictions (§ 667.5, subd. (b)).

The jury found Feflie guilty on all counts. In a bifurcated proceeding, after Feflie waived his right to a jury trial on the enhancement allegations, the trial court found all four prior conviction allegations true.

The trial court sentenced Feflie to a six-year term in county jail, comprised of two years on count 1, and an additional one year for each of the four enhancements. The court ordered Feflie's sentences on counts 3, 4 and 5 to run concurrently with his sentence on count 1, and stayed Feflie's sentences on counts 2, 6, and 7 pursuant to section 654.

III.

DISCUSSION

A. *Feflie cannot establish that his trial counsel rendered ineffective assistance in failing to object to the prosecutor's closing argument on* Doyle *grounds because he cannot demonstrate that he was prejudiced by counsel's failure to object*

Feflie contends that his trial counsel rendered ineffective assistance by failing to object to portions of the prosecutor's opening argument and rebuttal as violating *Doyle, supra,* 426 U.S. 610. Specifically, Feflie complains that the prosecutor improperly questioned his failure to mention at any time prior to testifying at trial that he believed it was his brother in the photographs.

6

1.      *Additional background*

At the time of Detective Gottfried's initial contact with Feflie regarding the photographs taken at ATM machines, Feflie acknowledged that the person depicted in the photographs could have been him, but denied knowing anything about the transactions. After Feflie was arrested, he invoked his *Miranda* rights.  The trial court ruled that the prosecution could introduce evidence regarding Feflie's initial interview, which took place prior to his arrest and prior to his invoking his *Miranda* rights, because he was not in custody during this exchange.  However, the court excluded evidence regarding a second exchange that occurred after Feflie had been arrested, during which Feflie invoked his *Miranda* rights.

During the prosecutor's closing argument, the prosecutor noted that when Feflie was shown the photographs from the ATM transactions, he said, " 'It looks like me,' " and " 'It could be me.' "  The prosecutor continued, "At no time did he say, 'It was my brother.'  We didn't hear that until today.  Those transactions happened way back in 2010. Here it is 2012, and for the first time we hear that it was his brother, Leroy.  It wasn't his brother, Leroy.  It was him.  The logical time to say, 'It was my brother,' or 'That is my brother,' was back in 2010.  Who says, 'It could be me.'  Either it is you, or it isn't you. You don't say, 'It could be me.'  Either you know you were there at the location, or you weren't at that location."

Defense counsel responded during closing argument that the prosecutor had failed to rebut Feflie's testimony that the person in the photographs was his brother, Leroy.

7

Defense counsel argued that Feflie had not previously identified his brother because he loves his brother.

During rebuttal, the prosecutor again addressed Feflie's testimony that the person in the photographs was his brother. The prosecutor reiterated that in response to Gottfried's question as to whether exhibit No. 16 depicted Feflie, Feflie responded, " 'It looks like me.' " The prosecutor then said:

> "He never once, *during the two-year period*—this happened in 2010. We are now in 2012. Not once did he ever tell any law enforcement, Detective Gottfried or any law enforcement, prosecution or anyone, that his brother was here, that it was his brother. It wasn't until he got in this courtroom and then came up with some story, it's his brother." (Italics added.)

Defense counsel did not object to the prosecutor's arguments regarding Feflie's failure to identify the person in the photographs as his brother at any point between the time of his initial, prearrest interview and the time of trial.

2.      *Analysis*

The Fifth Amendment generally "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin v. California* (1965) 380 U.S. 609, 615.) Moreover, because *Miranda* warnings contain an implicit assurance that no penalty will attach to silence in the face of police interrogation, "[i]n such circumstances [where a defendant has remained silent after the giving of *Miranda* warnings], it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle, supra,* 426 U.S. at p. 618.) In *Doyle*, the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time

8

of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." (*Doyle, supra,* at p. 619.)

Feflie's attorney did not object to the prosecution's arguments that Feflie challenges on appeal. Generally, a failure to object in the trial court results in forfeiture of a claim of *Doyle* error. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 (*Coffman and Marlow*).) However, Feflie alleges in the alternative that his attorney's failure to object constituted ineffective assistance of counsel. We address the merits of this latter contention.

To establish ineffective assistance of counsel, a defendant must show not only that counsel's performance was deficient and fell below an objective standard of reasonableness, but also that it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Without a showing of prejudice, a claim of ineffective assistance fails and inquiry into the adequacy of counsel's performance is unnecessary. (*People v. Sanchez* (1995) 12 Cal.4th 1, 40-41, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

Feflie contends that the prosecutor's comments regarding Feflie's silence and, specifically, his failure to say anything to law enforcement about the person in the photographs being his brother, between the time of his first exchange with Detective Gottfried and the time of trial, constitutes *Doyle* error because the prosecutor was relying on Feflie's post-*Miranda* silence to impeach an explanation that Feflie offered at trial.

9

The People contend that there was no *Doyle* violation because the prosecutor was not "draw[ing] meaning from appellant's silence, but instead, commented on his prior inconsistent statement."

To the extent that the prosecutor was drawing a distinction between what Feflie said to Detective Gottfried regarding the photographs (i.e., that the person in the photographs looked like him and/or could have been him) and his trial testimony that the person in the photographs was his brother, these comments do not constitute a *Doyle* violation. Feflie was not in custody at the time of his conversation with Detective Gottfried, and there was thus no need for *Miranda* warnings. However, to the extent that the prosecutor's comments also suggested to the jury that it could draw some meaning from Feflie's silence (i.e., not identifying his brother as the perpetrator) during the two-year period between his interview with Detective Gottfried and trial, most of which was after he had been given his *Miranda* warnings and had invoked his rights, the prosecutor's comments violated *Doyle*.

Nevertheless, we are not convinced that it is reasonably probable that Feflie would have obtained a more favorable result if his counsel had registered an objection to the prosecutor's arguments. Rather, we conclude that any error is harmless beyond a reasonable doubt in view of the minor role that the comments at issue played in the People's case. The prosecutor did not rely heavily on the fact that Feflie failed to identify his brother as the perpetrator at an earlier point in time. Rather, the prosecutor's case was based on the presentation of photographic evidence from which the jury could easily

10

determine for itself whether Feflie was the perpetrator of the crimes. The jury had before it multiple photographs of the individual who used Contreras's ATM card, and could compare those photographs to the defendant. The jury had other photographs of both Feflie and his brother, as well. As the prosecutor pointed out, although the two men look similar to some extent, Leroy has very curly hair. The man in the photographs has longer hair, and it is not curly. The jury was also able to view Feflie's tattoos and compare those with the tattoos on the individual in the ATM photographs.

Given the state of the evidence, the record as a whole demonstrates that defense counsel's failure to object to the prosecutor's comments on *Doyle* grounds was harmless beyond a reasonable doubt. Because Feflie has not demonstrated prejudice, his claim of ineffective assistance of counsel fails. (See *Coffman and Marlow, supra*, 34 Cal.4th at p. 118 [lack of prejudice stemming from asserted *Doyle* error is fatal to claim that trial counsel rendered ineffective assistance in failing to object to challenged comments].)

B.      *"Free from custody"*

Feflie contends that the sentencing enhancement imposed on him pursuant to section 667.5 based on his prior conviction for possession of a controlled substance in January 2005 must be stricken because the prosecutor failed to prove beyond a reasonable doubt that Feflie did not remain free from prison custody for a period of five years. The People assert that the prosecution was required to show only that Feflie was returned to custody at some point within the five-year period, and was not required to

demonstrate, as Feflie argues, that Feflie was returned to custody within the five-year period as a result of having had his parole revoked.

1.    *Applicable statutory framework*

The operative information alleged that Feflie had suffered four prior prison term convictions as identified in section 667.5, subdivision (b).  Section 667.5, subdivision (b) provides in relevant part:

> "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony; *provided that no additional term shall be imposed under this subdivision for any prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a term of jail custody imposed under subdivision (h) of Section 1170 or any felony sentence that is not suspended*."  (Italics added.)

Subdivision (d) of section 667.5 provides further meaning to the term "prison custody" as used in subdivision (b):

> "For the purposes of this section, the defendant shall be deemed to remain in prison custody for an offense until the official discharge from custody, including any period of mandatory supervision, or until release on parole or postrelease community supervision, whichever first occurs, *including any time during which the defendant* remains subject to reimprisonment or custody in county jail for escape from custody or *is reimprisoned on revocation of parole or postrelease community supervision*.  The additional penalties provided for prior prison terms shall not be imposed unless they are charged and admitted or found true in the action for the new offense."  (Italics added.)

According to the so-called "washout" rule, if a defendant remains free from prison custody and does not commit a new felony for any five-year period following discharge from custody or release on parole, the enhancement does not apply.  (§ 667.5, subd. (b); see also 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 335, p. 433.)  Feflie argues that there is insufficient evidence to establish that he was not free

12

from prison custody or that he committed a new felony within the five-year period following his release on parole in 2005.[3]

### 2. *Additional background*

The prosecution presented evidence regarding Feflie's prior prison convictions, including testimony from an expert witness on fingerprints, certified records of conviction, a certified CLETS[4] printout, and a prison packet. This evidence demonstrated that after Feflie's last prior conviction, he was paroled on January 18, 2005. The conduct for which Feflie was convicted in this case occurred in June 2010. Because the time between when Feflie was paroled in 2005 and the commission of the offenses in this case in 2010 was greater than five years, an issue arose at trial as to whether Feflie had remained free from custody for a period of five years, such that the "washout" period of section 667.5, subdivision (b) applied.

The documents on which the trial court relied in making a true finding on the sentencing enhancement at issue demonstrated that Feflie was paroled on January 18, 2005. The notes from the Department of Corrections and Rehabilitation with respect to Feflie's "Chronological History" with the department reflect that on April 3, 2007, a

---

3    Although both prongs (i.e., being free from prison custody and incurring no new felony commission) must be met, there was no evidence presented that Feflie was convicted of a new felony during the relevant time period. Both parties focus their arguments on the question whether Feflie remained free from prison custody for the relevant time period.

4    California Law Enforcement Telecommunications System.

"hold" was placed on Feflie. Two days later, on April 5, Feflie was "Ret'd to RCC." The next handwritten note in Feflie's "Chronological History" demonstrates that on April 9, he was "Transfd. to RCW." The following handwritten note, dated April 11, appears in the file: "COP to reg 4/Orange . . . ."[5] Another document in the record evidences that Feflie was arrested for possession of a hypodermic needle or syringe on April 2, 2007.

At the sentencing hearing, defense counsel indicated to the court that Feflie was representing that he had been held on a "VOP," indicating a violation of parole, but that it was ultimately determined that he had not violated the terms of his parole and he was released four days later. The trial court said, "If they decided to not give him additional time, I don't see anything that says he was acquitted. What it says is he was returned to custody." Later, after reviewing the documents, the court said, "It looks to me like he was actually returned to custody and got Prop 36 June 8, '05. Returned to custody, November 18, '05. It says, [c]ontinued on parole for Prop 36. He was back in custody as of November 18, '05. It appears to me the five-year period did not wash out. He also was returned back from custody. He wasn't free from custody in '07. He was continued on parole for 11/07."

The notes to which the trial court appears to have been referring with respect to June 2005 and November 2005 are, respectively: "RTCA NIC COP per Prop 36, GCF, waiver signed 5-10-05," and "RTCA, NIC COP per Prop 36, GCF, waiver signed

---

5     The handwritten note contains some illegible characters that we are unable to decipher.

11-9-05." "RTCA" appears to refer to a "Return to Custody Assessment." (See <http://www.cdcr.ca.gov/realignment/docs/AB109_Revocation_Trends_for_Courts. pdf at p. 4>.) The People presented no evidence as to the meaning of these notations.

3.     *Analysis*

"The prosecution has the burden of proving beyond a reasonable doubt each element of the section 667.5, subdivision (b) sentence enhancement," including that no five-year "washout" period applies.  (*People v. Fielder* (2004) 114 Cal.App.4th 1221, 1232 (*Fielder*).)  When a defendant challenges on appeal the sufficiency of the evidence to sustain the trial court's finding that the prosecution has proven all of the elements of the enhancement, we must determine whether substantial evidence supports that finding; the test on appeal is whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the enhancement beyond a reasonable doubt. (*Ibid.*)

As previously noted, subdivision (d) of section 667.5 specifically describes the circumstances under which a defendant "shall be deemed" to be in prison custody for purposes of the enhancement statute.  That subdivision provides that a defendant shall be deemed to be in prison custody for the period of time the defendant "is reimprisoned on revocation of parole or postrelease community supervision."  (*Ibid.*)  The appellate court in *In re Panos* (1981) 125 Cal.App.3d 1038 (*Panos*) construed the meaning of the phrase "reimprisoned on revocation of parole" in section 667.5, subdivision (d), and concluded that, in view of the underlying purposes of the enhancement, the phrase refers to more

15

than a "temporary custodial confinement." (*Panos*, *supra*, at p. 1043, italics omitted.) Specifically, the *Panos* court determined that the phrase refers to "reimprisonment following actual parole revocation." (*Ibid*.) We agree with the *Panos* court that the wording of the statute contemplates something more than the temporary confinement in a prison setting that typically follows the suspension of parole while revocation proceedings are pending. The statute specifically refers to reimprisonment "on *revocation* of parole."

The People maintain that subsequent Supreme Court authority undermines this interpretation "of the word 'custody' as used in section 667.5." The People cite *In re Kelly* (1983) 33 Cal.3d 267, 275 (*Kelly*), overruled on other grounds in *People v. Langston* (2004) 33 Cal.4th 1237, 1244-1246, for the proposition that " 'custody' is a broad term regarding control by authorities; a person could be in custody of authorities regardless of whether parole was revoked after a formal hearing." The People argue that a "broader interpretation" of custody "makes ample sense" because, under the *Panos* court's understanding of the meaning of being in "prison custody," "a parolee who admits a violation and who never challenges a revocation of parole would apparently never be held in custody because he was not subject to a formal hearing." The People's argument reaches too far, both in its reliance on *Kelly*, and in its limited view of what is required under *Panos*.

In *Kelly*, the issue identified by the Supreme Court was "the interpretation of Penal Code section 667.5, subdivision (g), which defines 'prior separate prison term' for the

16

purpose of enhancing a sentence." (*Kelly, supra*, 33 Cal.3d at p. 269, fn. omitted.)[6] In

*Kelly*, the defendant was sentenced to four one-year enhancements pursuant to section

667.5, subdivision (b) based on his criminal history, which began when he was first

committed to state prison in 1958. The defendant was paroled, but in 1962, was

committed to prison on a second new offense, and had his parole revoked. He was again

paroled, but in 1967 he was committed to prison on a third new offense, and again had

his parole revoked. He was thereafter paroled, but was committed to prison on a fourth

new offense in 1973, and had his parole revoked yet again. He was later paroled again,

but was subsequently committed to prison for the offenses that resulted in the sentence

that he was challenging. (*Ibid.*) The defendant in *Kelly* filed a petition for habeas corpus,

contending that he had not served a "prior separate prison term" under the meaning of

subdivision (g) of section 667.5 because he had essentially been serving a single

continuous prison term. (*Kelly, supra,* at p. 270.)

The *Kelly* court rejected the defendant's argument, concluding instead: "[A] prior

separate prison term is defined as that time period a defendant has spent actually

incarcerated for his offense prior to release on parole. In addition, if the defendant has

violated his parole and has been sent back to prison, but has not received a new

---

6      Subdivision (g) of section 667.5 currently provides, as it did at the time the
defendant in *Kelly* was arrested:

> "A prior separate prison term for the purposes of this section shall mean a continuous
> completed period of prison incarceration imposed for the particular offense alone or in
> combination with concurrent or consecutive sentences for other crimes, including any
> reimprisonment on revocation of parole which is not accompanied by a new commitment
> to prison, and including any reimprisonment after an escape from incarceration."

commitment, that time block is deemed to be continuing.  If defendant has been returned

with the addition of a new commitment, however, the time block is not continued, and

only that portion of prison time spent prior to release on parole constitutes the prior

separate prison term." (*Kelly*, *supra*, 33 Cal.3d at pp. 270-271.)

In discussing the legislative intent, as evidenced by an amendment to the statute,

the *Kelly* court explained that in its current form, subdivision (g) of section 677.5

"differentiate[s] between a mere *revocation of parole*, and the *revocation of parole which*

*is accompanied by a new commitment*." (*Kelly*, *supra*, 33 Cal.3d at p. 271, italics added.)

"It must be inferred that the Legislature desired the revocation accompanied by a new

commitment not to count in the 'period of prison incarceration' for the offense for which

parole was revoked; instead, this new 'period of prison incarceration' should be counted

as a *new* term based on the new commitment.  Thus, it is clear that the Legislature

intended to amend subdivision (g) to provide for an enhancement when a prisoner is

returned to prison on revocation of parole and, at the same time, is incarcerated for a new

offense." (*Ibid.*)  Importantly, the *Kelly* court repeatedly refers to the "revocation of

parole" when discussing reimprisonment.

In rejecting the defendant's arguments, the *Kelly* court explained, " '[P]eriod of

prison incarceration' [is not] equivalent to 'custody' as defined in subdivision (d).

'Custody' simply refers to control of the petitioner by the authorities.  'Period of prison

incarceration,' on the other hand, refers to a block of time actually spent in an

incarcerating facility.  This block of time may or may not include time spent in the

18

facility upon revocation of parole—if in accompaniment to a new commitment, it would not. 'Custody' is a much broader concept [than 'period of prison incarceration']." (*Kelly, supra*, 33 Cal.3d at p. 274.) Thus, the *Kelly* court rejected the idea that the "word 'custody' is relevant to the word 'completed' in subdivision (g)," and concluded that for purposes of subdivision (g) of section 667.5, "whether the *period of the actual prison incarceration* has been completed is the issue—*not* whether the entire prison *sentence* has been completed." (*Kelly*, *supra*, at p. 274.)

In arguing that "prison custody" as used in subdivision (d) of section 667.5 does not require reimprisonment *pursuant to parole revocation*, but instead could refer to even the temporary detention of a defendant prior to revocation, the People seize on this statement in *Kelly*: " 'Custody' simply refers to control of the petitioner by the authorities. 'Period of prison incarceration,' on the other hand, refers to a block of time actually spent in an incarcerating facility. This block of time may or may not include time spent in the facility upon revocation of parole—if in accompaniment to a new commitment, it would not. 'Custody' is a much broader concept." (*Kelly, supra*, 33 Cal.3d at p. 274.) However, it is clear from the entirety of the *Kelly* court's discussion that the Supreme Court was not suggesting that the term "custody" as used in section 667.5, subdivision (d) could refer to something *less* than reimprisonment after revocation of parole. In fact, the *Kelly* court repeatedly refers to the "revocation of parole" in relation to its discussion of "custody." It is clear that the *Kelly* court was simply rejecting the defendant's contention that his incarceration upon parole revocation, together with a new period of commitment for a

19

new offense that he was serving concurrently, should be considered a single term of imprisonment, such that he could not suffer multiple one-year enhancements for each new offense for which he had been convicted and committed to an additional term of imprisonment. The People's contention that *Kelly* somehow undermines the very clear holding of the appellate court in *Panos*, *supra*, 125 Cal.App.3d at page 1043, is misplaced. *Kelly* is not inconsistent with the holding in *Panos*; rather, the *Kelly* court's repeated references to reimprisonment "*upon revocation of parole*" in reference to the term "custody" as set forth in subdivision (d) of section 667.5, demonstrate that the Supreme Court implicitly agreed with the appellate court's holding in *Panos* (although the direct question of the meaning of "custody" in subdivision (d) was not before the *Kelly* court).

We also disagree with the People's contention that under *Panos*, "a parolee who admits a violation and who never challenges a revocation of parole would apparently never be held in custody because he was not subject to a formal hearing." The ultimate question under *Panos* is not whether the defendant "was . . . subject to a formal hearing," as the People suggest, but, rather, whether the defendant was reimprisoned upon having his or her parole revoked, regardless of whether that result comes by way of a formal hearing in which the defendant has challenged the violation or instead, results from the defendant admitting to a violation. As the *Panos* court noted, not every commission of a parole violation results in the revocation of parole and reimprisonment. (*Panos*, *supra*, 125 Cal.App.3d at p. 1043, citing *Morrissey v. Brewer* (1972) 408 U.S. 471, 488.) Thus,

20

although it may be true that a defendant who admits to a parole violation might not be reimprisoned, it is also true that a defendant who challenges the revocation of parole might not be reimprisoned, even if he or she is ultimately found to have committed the alleged violation. On the other hand, a defendant who admits having committed a parole violation does not necessarily avoid the possibility of having his or her parole revoked simply by admitting the violation. The key issue is whether the defendant has had his or her parole revoked—*not*, as the People suggest, whether the defendant has chosen to participate in a full, formal, and adversary proceeding, or instead, has waived his or her right to such a proceeding. We therefore reject the People's suggestion that a broader "definition of custody" than the one provided in *Panos* for purposes of the five-year "washout" period provided for in section 667.5, subdivision (b) applies.

We conclude that the People were required to demonstrate that Feflie did not remain free from "reimprisonment following actual parole revocation" for a period of five years (*Panos*, *supra*, 125 Cal.App.3d at p. 1043, italics omitted) in order for the trial court to make a true finding with respect to the section 667.5, subdivision (b) enhancement.

The records that the prosecutor presented do not constitute adequate proof that there was not a continuous five-year period in which Feflie was free from prison custody after he was sentenced to parole on January 18, 2005. There is nothing in the record that establishes that Feflie's parole was revoked and that he was returned to prison custody upon the revocation of parole at any point between January 18, 2005 and the commission

21

of his most recent offenses.[7] Because the prosecutor failed to present such evidence, the record lacks substantial evidence to support the trial court's finding that there was no five-year period following Feflie's imprisonment and subsequent release on parole in 2005 in which he either was not in prison custody or did not commit an offense resulting in a felony conviction. We therefore vacate that finding and strike the one-year sentence enhancement imposed as a result of the finding.

The next question we address is whether there remains anything to be done with respect to the prison prior enhancement allegation. Feflie contends that the one-year enhancement imposed for his January 2005 conviction should be stricken and that should be the end of the matter. The People contend that the proper course is for this court to order a limited remand to allow the People to present additional evidence to support the prior prison term allegation.

The People's position appears to be correct: "Retrial of prior conviction findings is not barred by the state or federal prohibitions on double jeopardy even when a prior conviction finding is reversed on appeal for lack of substantial evidence." (*Fielder, supra*, 114 Cal.App.4th at p. 1234, citing *Monge v. California* (1998) 524 U.S. 721, *People v. Monge* (1997) 16 Cal.4th 826, *Cherry v. Superior Court* (2001) 86 Cal.App.4th 1296, and *People v. Scott* (2000) 85 Cal.App.4th 905.) We therefore remand the case to

---

7     By arguing solely that the term "custody" should be defined more broadly than it has been defined in *Panos*, *supra*, 125 Cal.App.3d at page 1043, and should not require a showing that a defendant was returned to prison upon the revocation of parole, the People implicitly concede that the record here does not and cannot demonstrate that Feflie was reimprisoned following the revocation of his parole.

22

permit the prosecution to produce adequate evidence to support application of the section 667.5, subdivision (b) enhancement to the prison term related to Feflie's January 18, 2005 sentence of parole.[8]  If the prosecution chooses not to present additional evidence, the enhancement shall remain stricken and the court should amend the judgment to reflect this.

---

[8]     As the People note in their briefing, Feflie may have already been released from custody as of May 2013, due to prison overcrowding.  The People argue that the case should nevertheless be provisionally remanded to allow the District Attorney to decide whether to present additional evidence to support the enhancement at issue.  We agree.

23

IV.

DISPOSITION

Feflie's convictions are affirmed. The trial court's true finding with respect to Feflie's prior conviction enhancement allegation related to his January 7, 2005 conviction (and corresponding January 18, 2005 parole sentence) is vacated and the corresponding one-year enhancement stricken. The matter is remanded to the trial court for the limited purpose of allowing the prosecutor to elect to present additional evidence to support this prior prison term enhancement allegation. If the prosecutor chooses not to present additional evidence, the enhancement shall remain stricken, and the trial court shall resentence Feflie and issue an amended judgment.


_____

AARON, J.

WE CONCUR:


_____

McCONNELL, P. J.


_____

NARES, J.


24